```
                  UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                       Docket #1:16-cv-07806
McFARLANE,                        :

                  Plaintiff,      :

    - against -                   :

FIRST UNUM LIFE INSURANCE COMPANY, : New York, New York
                                     February 13, 2017
                  Defendant.      :

                                  :
----------------------------------

                    PROCEEDINGS BEFORE
           THE HONORABLE KATHARINE H. PARKER,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:           BEGOS AND HORGAN & BROWN, L.L.P.
                         BY:  PATRICK W. BEGOS, ESQ.
                         2425 Post Road
                         Southport, Connecticut 06890
                         203-254-1900

For Defendant:           JEFFREY D. DELOTT, ESQ.
                         445 Broad Hollow Road - Suite 25
                         Melville, New York 11747
                         516-939-2999



Transcription Service: Carole Ludwig, Transcription Services
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

## <u>INDEX</u>

### <u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|

None

### <u>E X H I B I T S</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|

None

```
1                          PROCEEDINGS                    3
2              THE CLERK:  Calling case 16-civ-7806, McFarlane
3    v. First UNUM.
4              THE HONORABLE KATHARINE H. PARKER (THE COURT):
5    All right, we are here for a discovery conference.  There's
6    a number of issues before the Court.  The first, I have the
7    issue of depositions and then the issues concerning
8    plaintiff's interrogatories and document requests.
9              First, I'd like to address plaintiff's request
10   for disclosure of the three documents listed on defendant
11   First UNUM's privilege log.  I have looked at those
12   documents in camera, and I am of the view that these do
13   relate to the administrative record and that they were not
14   created because of litigation.  So these should be
15   produced.
16             Next I want to talk about plaintiff's requests
17   for depositions.  So as I understand it, Mr. Delott, you're
18   seeking the depositions of two individuals, Adams and
19   Kouros, is that correct?
20             MR. JEFFREY D. DELOTT:  Yes.  But can I address
21   one thing regarding the privileged documents?
22             THE COURT:  Mm-hmm.
23             MR. DELOTT:  At the last hearing I brought up
24   that part of the administrative record contained another
```

```
 1                          PROCEEDINGS                    4
 2  document that specifically referred to an attorney-client
 3  consultation.  And we've heard that that information would
 4  be produced, but subsequently, the amended privilege log
 5  did not reference it.  And I don't know if -- I would think
 6  that whatever is related to that should also at least be
 7  produced for an in camera review.
 8            THE COURT:  I'm not sure what you're referring
 9  to.
10            MR. PATRICK BEGOS:  There's a -- I think I can
11  explain.  In the administrative record what typically
12  happens is the claims person will have sort of like an
13  activity sheet that says this is what I'm going to do.
14            THE COURT:  Like a log?
15            MR. BEGOS:  Kind of, yes.
16            And in December -- I think it's December 2015 --
17  there's one of those activity sheets that essentially
18  said -- and I'm paraphrasing -- I'm going to request a
19  legal review of some question -- I forget what it was.  I
20  don't see anything else in the administrative record about
21  it.  I think whatever consultation the benefits specialist
22  was looking for didn't happen, but I'm running that down
23  with UNUM.  If there is some documentation about some
24  consultation, we'll either produce it based on your Honor's
```

1                          PROCEEDINGS                    5

2  ruling or log it.  But my best guess right now is there is

3  no -- the consultation didn't happen.

4              THE COURT:  Okay.  All right.  So it's premature

5  to deal with that Mr. Delott.

6              MR. DELOTT:  Thank you.

7              THE COURT:  So let's move onto the depositions.

8  There are two depositions that you've requested, I believe,

9  of Mr. Adams and Mr. Kouros, is that correct?

10             MR. DELOTT:  Adams -- it was my mistake -- it's

11 Adam Peters -- I kept saying "Adams" by mistake -- but Adam

12 Peters and Peter Kouros.

13             THE COURT:  Who is Adam Peters?

14             MR. DELOTT:  Adam Peters is the claim rep who

15 made the, I guess, the approval and the termination.  He

16 issued the letter that notified the claimant that she was

17 being approved for benefits as well as the letter that she

18 was being denied or terminated benefits.

19             THE COURT:  And Mr. Kouros, he's a doctor?

20             MR. DELOTT:  He's a doctor who reviewed the file

21 both when the claim was approved and when the claim was

22 terminated.

23             THE COURT:  And did First UNUM state the reasons

24 for the discontinuance of the LTD benefits in the claim

1                              PROCEEDINGS                         6

2    denial letter?

3            MR. DELOTT:  Well, it provided some reasons that

4    I don't think are wholly consistent with what's in the

5    administrative record.

6            THE COURT:  Okay, well, the letter was from

7    Mr. Peters, is that right, as he was reviewing the

8    information, including any medical information provided by

9    Dr. Kouros, is that right?

10           MR. DELOTT:  Well, he was, you know, under a risk

11   that he was required to consider the entire administrative

12   record.  It appears that the only evidence that was

13   considered was, I guess you could call it the time-

14   concurrent evidence relative to the termination.  And I

15   don't think that -- there's nothing regarding an analysis

16   of how any of the information in the file for the previous

17   year and a half, two years, was analyzed at all.  That's

18   what I'm trying to get at in the deposition.

19           THE COURT:  Could you just say that more simply

20   so I understand?  What was the specific reason given for a

21   discontinuance of the benefits?

22           MR. DELOTT:  That there didn't appear to be

23   evidence to support the functional limits, limitations, to

24   preclude the claimant from working.

```
 1                        PROCEEDINGS                    7

 2              THE COURT:  And did the definition of

 3   "disability" under the plan remain the same at the time

 4   that the benefits were discontinued --

 5              MR. DELOTT:  Yes.

 6              THE COURT:  -- versus the beginning?

 7              MR. DELOTT:  Yes.

 8              THE COURT:  Okay.  This isn't a situation where

 9   there's a change in the --

10              MR. DELOTT:  No.

11              THE COURT:  -- definition of "disability" after

12   18 months or two years?

13              MR. DELOTT:  Correct.

14              THE COURT:  Okay.  All right.  And Dr. Kouros --

15   so you're saying you're trying to get at what,

16   specifically, through a deposition?

17              MR. DELOTT:  Well, I'm trying to -- the benefits

18   were approved, then the benefits were terminated.  It seems

19   to me that there either has to be benefits that the

20   condition changed so there was improvement, which means

21   that she's no longer entitled to disability benefits, or

22   after she was approved, they came up with some evidence

23   that indicated she should never have been approved in the

24   first place.  That's what I'm trying to get at.  There's
```

```
 1                              PROCEEDINGS                    8
```

nothing about that in the termination letter, there's

nothing about that anywhere in the claim cloud.

THE COURT:  And why do you need the deposition to

make these arguments?

MR. DELOTT:  Because the information that I would

need to support these claims is not in the claim file.

THE COURT:  Well, if you're saying that the

decision discontinuing the benefits is inconsistent with

the claim file, what was submitted in the claim file, why

is it that you also need a deposition?  Can't you just

argue from the administrative record that it's

inconsistent?

MR. DELOTT:  Well, defendant has already

indicated that that's not their theory of the case; they

never even considered whether there was a change in

definition.  You know, I'm not seeking discovery to attack

their defenses; the whole purpose of discovery is to find

evidence that will support my claims.  My claims are that

there's no evidence regarding her change in condition,

there's no evidence indicating that the original decision

was wrong.  That's what I'm trying to get at.  It's nowhere

in the file, it's not in any document.  And from the four

corners of what's been produced I can't find it; it's not

1                          PROCEEDINGS                        9

2  there.

3          THE COURT:  So from your review of the file, your

4  position is that the claim that all of the medical

5  information remained the same and that the decision that

6  there was no evidence to support disability was just made

7  based on no change in information; is that --

8          MR. DELOTT:  No, what I'm trying to find out, at

9  one point -- there's no medical file, there's no medical

10  test, there's no medical finding that I can find that

11  indicates there's a change in the fibromyalgia or chronic

12  fatigue.  Those are the two conditions that UNUM found her

13  disabled.  Now, I don't care if there's another doc --

14  they're going to say, "Well, our doctors reviewed it, and

15  we don't think there's anything to support it as of this

16  point in time."

17          Well, I don't care if they're ignoring what

18  happened previously; they're required to look at everything

19  that's in the file.  To support my claim that what they did

20  was wrong or at least arbitrary and capricious, I want to

21  be able to say, "Where's the evidence of any change?

22  Where's the evidence of any improvement?  Where's the

23  evidence that something was wrong?"

24          Now, if it's not in the file, I don't know if

1                          PROCEEDINGS                    10

2   they're going to claim that there was some improvement.  I

3   can't tell, but I need to know that.  That's the purpose of

4   discovery, for me to find out what the theory is going to

5   be.  I shouldn't have to wait till summary judgment to say,

6   "Oh, in fact we are going to argue that; we're not going to

7   argue that."

8            THE COURT:  But what I'm hearing from you is that

9   there is nothing in the file that would support either of

10  those so you would be able to argue that there's no basis

11  in the administrative record or in the claim denial letter

12  for taking that position, if I'm understanding what you're

13  saying.

14            MR. DELOTT:  Well, that might be my review.  But

15  I'm trying to find out if they have any contention that

16  there is some evidence that supports a change in condition,

17  if there is some evidence that supports improvement, that

18  there is some evidence that says, "Oh, we've got this new

19  exam finding, we've got this new exam test that indicates

20  we never should have approved her in the first place."

21  That's not in the record that I can tell, but I'm not a

22  mind reader.  And I shouldn't have to wait until summary

23  judgment to find that out.

24            THE COURT:  And what about Dr. Kouros?

```
 1                        PROCEEDINGS                    11
 2            MR. DELOTT:  He's the doctor who reviewed the
 3   file both at the time that the claim was approved and the
 4   claim was terminated.  And the reason it was approved was
 5   based upon the symptoms.  Again, the termination letter
 6   doesn't say anything about what happened to the symptoms.
 7   It doesn't say the symptoms got better, got worse, were the
 8   same.  And that was the whole basis for the original
 9   approval.  So how did the symptoms change from the
10   beginning till the end?  It's not in the file.  I need the
11   discovery, the deposition, to find that out.
12            THE COURT:  Did -- Dr. Kouros did not
13   independently examine plaintiff, is that correct?
14            MR. DELOTT:  That's correct.
15            THE COURT:  And so he was looking at information
16   submitted by plaintiff's doctors at the time of the
17   original acceptance of the claim and then also what had
18   been submitted since then at the time of denial, is that
19   right?
20            MR. DELOTT:  That's all he could do because he
21   did not examine, correct.
22            THE COURT:  All right.
23            MR. DELOTT:  So examining the same type of
24   information, he came to opposite conclusions, and I'm
```

```
 1                            PROCEEDINGS              12
 2  trying to get to the source of that because I can't find it
 3  in his report.  It's certainly not in the termination
 4  letter.
 5           THE COURT:  All right.  And is it your position
 6  that Dr. Kouros' and Peters' decision on the discontinuance
 7  of the LTD benefits was contrary to information submitted
 8  by plaintiff's own doctors?
 9           MR. DELOTT:  Yes.
10           THE COURT:  All right, Mr. Begos, I'll hear from
11  you on the depositions.
12           MR. BEGOS:  Thank you, your Honor.
13           I think from your questions you understand at
14  least part of my argument here.  But just to go into a
15  little bit of the facts, the claim was approved following a
16  review by Dr. Kouros.  And what Dr. Kouros essentially said
17  is based on what's in the file now and what the treating
18  physicians are saying, now, unless there's something
19  contrary in the file, which I don't see, then we'll accept
20  it's reasonable that what the treating physicians are
21  saying is supported.
22           Then as the claim went on and she was paid for, I
23  think, a year and maybe 14 months, additional medical
24  evidence was gathered, treating physicians were spoken to
```

```
 1                          PROCEEDINGS                      13
 2   by Dr. Kouros, and then Dr. Kouros, he did a number of
 3   reviews along the way; but shortly prior to benefits being
 4   terminated, he did a review of every piece of medical
 5   evidence in the record including his conversations with the
 6   treating physician, which were documented themselves, and
 7   said that at that point the evidence we have in front of us
 8   doesn't support continuation of benefits.
 9           And then Mr. Peters, he's not a doctor, so
10   there -- oftentimes there's this notion that you have a
11   reviewing doctor and you have a treating doctor, and then
12   the benefits specialist, who is not a doctor, is supposed
13   to weigh the -- you know, that there are two medical
14   opinions that the benefits specialist is supposed to weigh.
15   They don't have the competence to weigh medical opinions.
16   The reason for Dr. Kouros's review is to review the medical
17   evidence and to come up with an evaluation.  So then
18   Mr. Peters explained the basis for the termination of
19   benefits, which is essentially what I just said.  There's
20   no support for continuation of benefits under the policy
21   definition.
22           Now I understand Mr. Delott wants to argue this
23   either/or thing; either there was a mistake made when
24   benefits were paid, or her condition improved.  We're not
```

taking either position.  We're certainly not suggesting

that there was a mistake made such that the plaintiff is

required to return the benefits that First UNUM paid her;

those benefits are hers to keep.  And there's no contention

in Mr. Peters' records or in Dr. Kouros's reviews that her

condition improved.  She had fibromyalgia at the beginning,

she had fibromyalgia at the end.

What changed is the, I guess I'd call it, the

longitudinal evidence that showed what was and what wasn't

done, what treatments she did and didn't have over the

course of time.  Some of her doctors changed their opinions

a little bit.  So there was a different body of evidence at

the second decision.  And all of that is explained in the

record.  And Dr. Kouros has multiple reports in the record

which explains what he looked at and what conclusions he

reached.  The letter that Mr. Peters wrote is several pages

long -- I forget how many -- 5 or 6 or 7 pages long, with a

detailed discussion of what happened.  And then Mr. Delott

was able to review all that and submit an administrative

appeal saying why he thought the decision was incorrect and

should be reversed.

And part of the reason we're here talking about

Mr. Peters is because Mr. Delott didn't let First UNUM

1                         PROCEEDINGS                    15

2    finish the administrative appeal, but came to court and

3    said that the, you know, administrative remedies were

4    deemed exhausted and that he's entitled to go right to

5    court.  Ordinarily, we would be talking about what was the

6    basis for the appellate determination, but there was no

7    appellate determination here.

8              So I think, as some of your Honor's questions

9    indicated, everything in the record -- Mr. Delott has

10   everything in the record that he wants to make the

11   argument.  If he thinks that he can win by saying either

12   First UNUM made a mistake or her condition improved -- and

13   there's no evidence in the record to support that -- then

14   he wins.  He doesn't need to ask Mr. Peters, you know, "Is

15   it true that you don't think that her condition improved?"

16   I mean, that's really -- and the problem I have with that

17   kind of construction is it's asking for a one-sentence

18   summary of a, I think, 1,400-page claim file.  Her

19   condition is what it was at different points in time.  And

20   I would not want to characterize it as the same, improved,

21   not improved.  There was certainly different evidence.

22   There's no dispute that she had fibromyalgia; nobody's

23   claiming that she suddenly got better, but simply that the

24   evidence that was available to First UNUM when it

```
 1                        PROCEEDINGS                    16
 2   terminated benefits was different than the evidence that
 3   was available when it paid benefits.  And the real thrust
 4   of his argument is a company like First UNUM shouldn't give
 5   somebody like plaintiff the benefit of the doubt and pay
 6   benefits when the evidence that it has without being
 7   contradicted appears to be sufficient.
 8            So that's what happened.  And I still don't see
 9   any reason why deposing Mr. Peters or deposing Dr. Kouros
10   is going to add to anything beyond what's in the record
11   because I will say I've spoken to a lot of plaintiff's
12   people, I've spoken to a lot of doctors, I've defended some
13   of their depositions.  Almost to a person they don't
14   remember anything about a claim after, you know, six months
15   or a year after it's been determined.  What they remember
16   is what's in the administrative record.  So it's not as
17   though Mr. Delott is going to get some sort of statement
18   that says, "Ah, yes, I remember this.  This lady was so-
19   and-so, and this is the real reason why I terminated
20   benefits."
21            THE COURT:  Mr. Begos, you've moved to dismiss
22   the complaint on the basis that you haven't finished the
23   appeal, is that right?
24            MR. BEGOS:  Yes.
```

```
 1                          PROCEEDINGS                    17

 2              THE COURT:  So you're seeking remand?

 3              MR. BEGOS:  Well, not remand.

 4              THE COURT:  Dismissal or --

 5              MR. BEGOS:  Dismissal of -- there's two claims.

 6   All of this discovery relates to the first claim.  That

 7   we're seeking to dismiss on the grounds that the plaintiff

 8   didn't exhaust her administrative remedies, yes, your

 9   Honor.

10              THE COURT:  Okay.  And these are the only

11   depositions at issue at the moment, is that right?

12              MR. DELOTT:  Correct.

13              If I could respond briefly?

14              THE COURT:  Sure.

15              MR. DELOTT:  You just heard Mr. Begos state that,

16   based upon additional evidence, they now concluded that

17   there was no basis to continue.  That's what I'm trying to

18   get at:  what additional evidence are they claiming

19   supported a change, what medical tests?  They said there

20   was something that a treating doctor said that was

21   different that supported a lack of continuation of

22   benefits.  I don't see that.  I want to know what they

23   contend.

24              THE COURT:  Right.  But you can make that
```

1                           PROCEEDINGS                   18

2    argument from the administrative record.  In other words,

3    if you're saying that the decision is inconsistent, that

4    there was no change in the condition based on what was

5    submitted, you're not precluded from making that argument.

6    What I just heard Mr. Begos say is that the claims decision

7    is based on the record, whatever's there.  And I don't see

8    why you need a deposition to make the arguments that you're

9    making.  There's absolutely no reason, because you can read

10   the administrative record as well as the Court or anybody

11   else can read the administrative record.

12         MR. DELOTT:  I can read the administrative

13   record; I can't read UNUM's mind.  I shouldn't have to wait

14   until summary judgment papers are filed to find out what

15   evidence they're claiming supported this discontinuation of

16   benefits.  If he's saying that, you know, the doctor or a

17   claims rep isn't going to remember anything, which is also

18   really not credible because before the depositions, they're

19   going to be prepped, they're going to go over at least

20   their letter in the report -- right?  I should think that

21   that would refresh your recollection.  But the whole

22   purpose of discovery is to find evidence to support your

23   claims.  And what I'm trying to find right now is nowhere

24   in the four corners of the administrative record.  If

1                          PROCEEDINGS                    19

2     they --

3            THE COURT:  Right.  Which is, frankly, helpful to

4     your position.

5            MR. DELOTT:  But I don't know that.  If they were

6     to say -- if they were to give me an answer or if they were

7     to send a letter saying, "We have no evidence of any change

8     in the Functional Capacity of this claimant.  We have no

9     evidence of any change or improvement in her medical tests.

10    We have no evidence of any change or improvement in exam

11    finding.  We have no evidence of any change at all in the

12    medical information relating to the symptoms.  The only

13    evidence we have that's different now is that our doctors

14    reviewed the same evidence, and we're just coming to the

15    opposite conclusion," I'd be happy to accept that.

16           THE COURT:  Right.  So you can make a strong

17    argument against -- opposing summary judgment based on that

18    is what I'm hearing.  But the other issue is you don't have

19    a letter on appeal, is that correct?

20           MR. DELOTT:  Correct.

21           THE COURT:  Is the appeal still pending?  Is that

22    still being processed, or has it been terminated?

23           MR. BEGOS:  It was terminated when the litigation

24    was filed, your Honor.

```
 1                      PROCEEDINGS                    20

 2           THE COURT:  So you don't have -- plaintiff does

 3   not have a letter from the appeals process describing the

 4   reasons for denying the claim?

 5           MR. DELOTT:  Well, I do, because the reasons why

 6   the claim was denied are in the termination letter.

 7           THE COURT:  Right.  But you have nothing from an

 8   appeals standpoint; you have no letter from an appeals

 9   standpoint.

10           MR. DELOTT:  Well, all the information that's in

11   the file up to this point is already in the file.  And that

12   was already considered, supposedly, prior to the

13   termination letter being issued.  So the reasons, based

14   upon the information that's already in the claim file, are

15   supposed to be in the termination letter.

16           THE COURT:  Okay.  All right.  I would like to go

17   onto the document requests and interrogatories for the

18   moment.  And, Mr. Begos, I'd like you first to go through

19   the specific document requests and interrogatories that you

20   have an issue with.  And I have gone through them, but I

21   want -- because I have it from a letter Interrogatory 11,

22   12, 13, 19, 20; but I think that there may be more.  So

23   maybe you can just take me through the specific ones?

24           MR. BEGOS:  Sure.  Let me do that.  And I have to
```

```
 1                          PROCEEDINGS                    21
 2    admit that it was one cross-referencing that I didn't do
 3    coming in today because I was grouping them together for
 4    purposes of the letter.
 5             But we have document requests -- if you just give
 6    me one second, I can do that for you.  We have, your Honor,
 7    Document Requests 1 through 7, 9, 10, 12, and 13 through
 8    20.
 9             THE COURT:  Okay.  And this is Document 31 --
10    well, I have your responses to plaintiff's document
11    requests dated January 16, 2017.
12             MR. BEGOS:  Right.  And I think those are in
13    Document 30, but, yeah, they were definitely filed by
14    plaintiff, I believe.
15             THE COURT:  Okay.  All right.  So Document
16    Request No. 1, each medical review that Peter Kouros,
17    Norman Brest and Gary Greenhood prepared for defendant
18    during the last three years.  Mr. Delott, are you
19    requesting decisions concerning other claimants in other
20    plans?
21             MR. DELOTT:  Yes.  They could be redacted; I
22    don't need any personally identifiable information.
23             THE COURT:  And for what reasons do you need
24    that?
```

```
 1                        PROCEEDINGS                    22

 2           MR. DELOTT:  Well, many reasons.  If there's a

 3   large proportion of claims that are always denied by these

 4   people, then that indicates that, as in-house UNUM doctors,

 5   they have a predisposition to deny and terminate claims

 6   when they shouldn't.  If there are other Norman Brest

 7   claims relating to fibromyalgia and he consistently uses

 8   the same reasons, such as a lack of neurological findings

 9   as a basis to deny the claim, when the Second Circuit has

10   repeatedly said that makes no sense, when that's consistent

11   with the white paper that UNUM had regarding fibromyalgia

12   as a basis -- in effect a guidebook on how to deny those

13   claims, I think that's relevant evidence pertaining to

14   conflict of interest.  I mean, I could go on; there are

15   many reasons.

16           THE COURT:  And was this guidebook in effect

17   during the time that the plaintiff's claim was considered?

18           MR. DELOTT:  There's no evidence that it's never

19   been out of service, out of commission.  All I can say is

20   that the same excuses that they identified in the

21   termination letter and in the record are consistent with

22   the reasons I've seen in the white paper.

23           THE COURT:  And is --

24           MR. DELOTT:  The white paper is part of the
```

```
 1                        PROCEEDINGS                    23
 2   administrative record.
 3             THE COURT:  Okay.  And the reason -- and is the
 4   claim denial decision consistent with that policy?
 5             MR. DELOTT:  I --
 6             THE COURT:  In other words, did the benefit claim
 7   denial cite the white paper?
 8             MR. DELOTT:  It didn't cite the white paper, but,
 9   for instance, it said there's no basis -- the findings in
10   support of the limitations of the fibromyalgia don't make
11   sense because there's no evidence of decreased range of
12   motion, there's no evidence regarding neurological
13   abnormalities, which have absolutely nothing to do with
14   fibromyalgia.
15             THE COURT:  All right.  Now -- all right, let's
16   go onto Item 2, which is every claim decision letter that
17   Adam Peters prepared during the last three years.
18             MR. DELOTT:  Yes.  Well, for instance --
19             THE COURT:  That doesn't seem excessive to you?
20             MR. DELOTT:  Three years?
21             THE COURT:  Every claim decision for three years
22   regardless of the disability, regardless of the plan, that
23   doesn't seem excessive to you?
24             MR. DELOTT:  I didn't think three years was
```

PROCEEDINGS                    24

1

2  excessive because I've seen five and seven in other cases.

3  You know, if you think just limiting it to one year, I can

4  be satisfied with one year.

5          THE COURT:  I don't see how claim decisions

6  written by someone regarding other people with other kinds

7  of disabilities involving other plans with potentially

8  other definitions of disability are at all relevant to the

9  plaintiff's claim.

10          MR. DELOTT:  It could be, because, for instance,

11  if the approvals by Peters are largely based on what the

12  treating doctors say and if the denials and terminations

13  are based upon what the UNUM doctors say, I think that's

14  evidence of a conflict of interest again.  It was the

15  supreme court in the *Glenn* case that said, you know, when

16  you rely on doctors who solely serve the insurance company,

17  that's evidence of a conflict.

18          THE COURT:  All right.  And then let's look at 3,

19  for the last three years, each document concerning any type

20  of compensation or benefit from First UNUM that was

21  potentially available to these four individuals.  And,

22  again, why are you contending that's necessary?

23          MR. DELOTT:  Well, I'm trying to find -- I'm

24  trying to see if there's a connection between incentive

1                              PROCEEDINGS                    25

2    compensation and performance review or if there's a

3    performance -- well, I guess that's a different request

4    number.

5              THE COURT:  That's No. 4, is performance reviews.

6              MR. DELOTT:  Right.  But on 3, if the

7    compensation -- potential bonus compensation exceeds what

8    was actually received, you know, is that related to a claim

9    that -- or some indication that the LR on behalf of any of

10   these people was deemed excessive; or if they're getting

11   extra or maximum incentive compensation, is there something

12   in a performance review that logs the creative way they're

13   coming up to deny or close cases.

14             THE COURT:  Do you have any basis in the

15   administrative record for having a suspicion or reasonable

16   belief that these individuals operated under a conflict of

17   interest?

18             MR. DELOTT:  Yes.

19             THE COURT:  What is it?

20             MR. DELOTT:  Well, everything that was submitted

21   by the treating doctors support it.  I mean, they're the

22   people who were creating exam findings, sending the people

23   and reviewing first-hand the actual films as opposed to the

24   records of the tests.  They uniformly -- there was no, you

know, dissension among them.  There's really no reason even

to have an in-house doctor review it because there was

consensus from all the treating doctors that this person

was unable to work in any capacity.  So here comes a new

review, and all three doctors basically slap one another on

the back and rubber-stamp what they say and said, "Yeah,

this guy, we're looking at the same material, we're not

going to talk about the symptoms because they're -- you

know, we're just going to say that the evidence as a whole,

vaguely we're reviewing it, and we don't think it

supports."

            You know, the doctors, to the extent that they

want to get bonuses -- I understand that there's this whole

pot, and the more denials that a team or a unit has, you

get to partake in that pot.  So there are all sorts of

incentives or there are all sorts of issues that lead to

conflict of interest.  You know, the more money that the

company makes as a whole, they have this pot that becomes

the bonus pot.  And they always talk about how the whole

company as a whole, everyone participates.  What everyone

does matters in terms of getting to partake in this bonus.

So it's a team effort.  So it's almost like a cult

mentality.  Everyone deny, and you'll get a bigger bonus.

```
 1                          PROCEEDINGS                    27
 2             THE COURT:  What from the administrative
 3    record -- what information do you have that is leading you
 4    to this knowledge?
 5             MR. DELOTT:  Not only in this case but in other
 6    cases.  All the things that I cited, that I allege in the
 7    complaint, they're cited in, I think, in my Exhibit B; they
 8    have a history of doing this.  There's no evidence that
 9    they've stopped.  To the extent that they do underwriting,
10    they have an assumed liability acceptance rate.  When the
11    approval rate starts to get above that, the liability
12    acceptance rate, that indicates there may be possible
13    profitability.  So as a business decision, regardless of
14    the merits of the case, they tend to either hold cases back
15    temporarily or deny more cases.  And that's what also gets
16    into the reserve.  If you want to increase your
17    profitability, you terminate a case; and regardless of
18    whether or not a court has already said that liability no
19    longer exists, they immediately recognize that as a profit.
20             So, you know, whether it's the money people who
21    are telling the managers and the directors that we have to
22    decrease our LR or increase the profitability, or it's the
23    actual claims people who want to have a better chance of
24    participating in a bigger bonus, you know, the conflict is
```

1                          PROCEEDINGS                    28

2    there.

3              THE COURT:  Well, you're already saying that

4    there's a structural conflict of interest and that there's

5    a heightened scrutiny in terms of the Court's review of the

6    claim decision, isn't that right?

7              MR. DELOTT:  Right.  And now I'm trying to find a

8    more specific conflict with these particular people.

9              THE COURT:  And why can't you argue conflict of

10   interest based on the information you just provided?  Why

11   do you need more discovery to argue that?  It seems as if

12   you've already stated information and that there's already

13   a structural conflict of interest, so the Court would give

14   a heightened review, anyway.

15             MR. DELOTT:  The Court doesn't stop -- the Second

16   Circuit doesn't stop there.  I don't remember whether it

17   was the -- it was probably your case, the *McCauley*

18   case -- the more evidence you have regarding the conflict

19   of interest, the more weight you give to that in assessment

20   of whether or not it's arbitrary and capricious.  So simply

21   saying that there's a structural conflict of interest, the

22   Court could sit there and say, well, that's fine and maybe

23   we'll only give it the minimum amount.  But the more

24   evidence that I can provide to the District Court regarding

PROCEEDINGS                    29

1
2    the conflict of interest, whether it's generic because of

3    the structural conflict of interest, or case specific, the

4    more weight I can convince the judge to give to that

5    conflict.

6            THE COURT:  But you don't -- as we sit here

7    today, you don't know, you don't have a basis that these

8    particular individuals were somehow more affected by any

9    of these policies that you've already described?

10           MR. DELOTT:  Well, I don't have a smoking gun.

11   And that's the point of discovery.  And the mere fact that

12   all the treating doctors unanimously said this person still

13   can't work and there was no change in the symptoms, there

14   was no change in any medical tests, there was no change in

15   any medical exam finding; and all of a sudden, all these

16   doctors come to the same exact opposite conclusion, I think

17   that raises at least a reasonable chance that can lead to a

18   good cause for having additional information accepted by

19   the District Court.

20           THE COURT:  All right.  And so I guess your

21   request No. 7, the CV of the individuals also relates to

22   this conflict issue?

23           MR. DELOTT:  Well, defendant already provided a

24   CV and some professional license information, but --

```
 1                        PROCEEDINGS                    30
 2            THE COURT:  Okay, so that's not an issue.
 3            MR. DELOTT:  Well, it might be because in their
 4   answer they indicated that they're only producing the non-
 5   privileged information.  And I said if they assert that
 6   there was no privileged information withheld, then I
 7   withdraw that objection.
 8            MR. BEGOS:  There was nothing withheld on the
 9   basis of privilege from --
10            MR. DELOTT:  Then I withdraw it.
11            MR. BEGOS:  -- the CV or licensing information.
12            THE COURT:  Okay, so 7 is not an issue, then;
13   you've produced that.
14            Okay, so with respect to No. 5, claims procedures
15   manuals, I take it there's -- you said that there was one
16   manual already produced, is that right?
17            MR. DELOTT:  Well, yes, there's the claim manual
18   that was produced.  And, again, I have sort of a qualified
19   problem here because I wanted a simple answer is that
20   everything that's relevant.  If they gave me an answer that
21   that covers everything and not just that here is something
22   that is responsive, then I withdraw my further objections.
23            THE COURT:  Well, is it?  Is there anything --
24   are there any other manuals or policies?
```

```
 1                         PROCEEDINGS                    31

 2              MR. DELOTT:  Well, manuals, training guidelines,

 3   instructive memoranda.

 4              MR. BEGOS:  I interpreted plaintiff's request --

 5   let me just say the manual is, it's basically an Intranet

 6   in the site that's constantly updated.  If you printed it

 7   out, I don't know how many thousands of pages it would be,

 8   but it's a lot.  And it's the set of procedures and

 9   practices that the entire benefit group within UNUM uses.

10   Now, what I interpreted plaintiff's additional request as,

11   if there's any other piece of paper anywhere in the company

12   that could arguably be considered a policy or a guideline

13   or a practice, either search for it or tell me that nothing

14   like that exists.

15              Now, with a company the size of First UNUM, with

16   a company of any size, I certainly can't represent that a

17   document doesn't exist.  I can say that the claim manual

18   that we produced is where people go when they're deciding

19   claims and there's a question about policies and

20   procedures.  That is the compilation of policies and

21   procedures.

22              THE COURT:  That's the key document for --

23              MR. BEGOS:  Yes.

24              THE COURT:  -- the benefits administrators?
```

```
 1                        PROCEEDINGS                    32
 2              MR. BEGOS:  Yes.  And --
 3              THE COURT:  So --
 4              MR. BEGOS:  -- appellate specialists and
 5    everybody else involved in the claims process.
 6              THE COURT:  All right.
 7              MR. BEGOS:  What I can't say is that, you know,
 8    somebody might not have a piece of paper in a drawer
 9    somewhere that Mr. Delott might argue was a procedure.  And
10    I think it would --
11              THE COURT:  Okay.
12              MR. DELOTT:  I'm not looking for something that
13    an isolated person may have.  I'm looking for training --
14              THE COURT:  It sounds to me like --
15              MR. DELOTT:  -- guidelines that may --
16              THE COURT:  It sounds like you have the manual
17    that's used.
18              MR. DELOTT:  I do have a manual, yes.
19              THE COURT:  So I think that this one sounds moot
20    based on what Mr. Begos has said.
21              MR. DELOTT:  All right.
22              THE COURT:  And then No. 6, all documents
23    concerning procedures for considering these various things
24    about plaintiff's particular condition of fibromyalgia and
```

```
 1                         PROCEEDINGS                    33

 2  chronic fatigue syndrome.

 3           MR. BEGOS:  And that's really the same thing,

 4  your Honor.  All of that, to the extent there's a procedure

 5  or a practice or a guideline or a policy --

 6           THE COURT:  Is in the same book.  And I guess the

 7  white paper regarding fibromyalgia?

 8           MR. DELOTT:  No, I did not find -- I went through

 9  the claim manual, and I did not find those four items.

10  And, again, if he's saying that they're there, then I'd

11  like him to identify them because, again, I can't read what

12  UNUM's mind is.

13           THE COURT:  Is there anything other than the

14  claims manual, or is there anything on the Intranet that

15  deals specifically with procedures related to these two c

16  conditions?

17           MR. BEGOS:  I am not aware of that.

18           THE COURT:  All right.

19           MR. BEGOS:  I'm happy to go back and ask again.

20  But I'm not aware of any kind of formal procedures or

21  policies or anything, you know, issued or published by a

22  company regarding these things.  But again, you know, my

23  concern about these, you know, all kinds of requests is if

24  some doctor has a medical journal on his bookcase --
```

```
 1                          PROCEEDINGS                    34

 2              THE COURT:  I think the Court understands that,

 3   and it's not reasonable to require the defendant to search

 4   for some lone document in a drawer that nobody remembers.

 5              MR. BEGOS:  I will ask if there are any policy --

 6              THE COURT:  But, certainly, if you can make the

 7   request if there's anything particular in terms of

 8   procedures, policies or training related specifically to

 9   fibromyalgia or chronic fatigue syndrome, I think that's

10   worth another inquiry.

11              MR. BEGOS:  I'll do that, your Honor.

12              THE COURT:  And then you can let Mr. Delott know.

13              All right, so then we have 9 and 10, all

14   documents concerning the conveyance of stock to these

15   individuals, and 10 is -- okay, so stock is related to

16   their compensation, the same reasons; and then all

17   documents concerning financial reserve information for

18   plaintiff's LTD claim and any changes in the amount of the

19   reserve.

20              Do you know whether or not any of the people who

21   are making the claim decision have information about

22   financial reserve information?

23              MR. DELOTT:  Well, that's exactly what *Metlife*

24   *v. Glenn* says you should look into.  You know, I think the
```

1

2  Court had something to do with separating the financial

3  people from the claims people.  That was actually given as

4  an example.  If anyone on plaintiff's claim had access to

5  reserve information that would support the claim that the

6  termination was as byproduct of that conflict of interest.

7          THE COURT:  Well, so wouldn't the question be any

8  documents related to financial reserve information for

9  plaintiff's LTD provided to decision makers on her claim?

10          MR. DELOTT:  Well, it didn't have to be provided

11  to, just accessible.  I mean, there were directors who had

12  input on this case, there were managers who had input on

13  this case.

14          THE COURT:  Still, that would be narrower.

15          MR. DELOTT:  I'm sorry?

16          THE COURT:  That would be narrower.  It would be

17  narrower to say if documents reflecting that information

18  was available or accessible to decision makers on the

19  claim.

20          MR. DELOTT:  Well, it doesn't necessarily have to

21  be decision makers because there were people who were

22  having an input on this claim that didn't necessarily get

23  involved in the evaluating of the medical evidence.  There

24  were, you know, there are directors and managers who

```
 1                        PROCEEDINGS                 36
 2  attended roundtable meetings.  You know, I don't know what
 3  their involvement was.  I don't know if they had access to
 4  reserve information; but if they did, that's certainly
 5  something that I'm entitled to tell Judge Abrams about.
 6            THE COURT:  I don't understand how they're
 7  connected to the decision makers on the claim.  I don't
 8  know who you're talking about.  Roundtable of discussing
 9  plaintiff's claim?
10            MR. DELOTT:  Yes.  Whether it was through a
11  roundtable, whether it's through some sort of validation
12  process.  There are other people besides this disability
13  specialist who reviewed this claim, who had input on this
14  claim.
15            THE COURT:  Besides Mr. Abrams?
16            MR. DELOTT:  Yes.
17            MR. BEGOS:  Mr. Peters.
18            THE COURT:  Peters.
19            MR. BEGOS:  He didn't have access.  The benefits
20  people, the appeals people, the doctors don't have access
21  to reserves.
22            Can I just make one -- I know you're focusing on
23  Mr. Delott, but I would hope to make just a brief comment
24  on some of this.  His argument so far has been the
```

```
 1                        PROCEEDINGS                    37
 2   administrative record doesn't contain anything to support
 3   First UNUM's determination denying benefits.  But yet, he's
 4   obsessed with things that he says aren't in the record and
 5   wouldn't be in the record and that he needs to find out
 6   things as to why people at First UNUM made this apparently
 7   unsupportable decision that has no basis in the record.
 8   And so part of my frustration with this is I've been down
 9   this road a lot with plaintiffs, and we have fights over
10   discovery that's absolutely essential.  And sometimes they
11   get some of it, but then we never hear about it again
12   because in reality it's not relevant to what the Court is
13   actually looking to determine.
14           So if Mr. Delott really thinks that there's no
15   question but that his client is entitled to continued
16   benefits, then that's going to be apparent from the
17   administrative record, and he can make his argument.  And
18   all of this discovery is a side show.
19           THE COURT:  Yeah, I'm inclined to agree with you,
20   Mr. Begos.  And for the --
21           MR. DELOTT:  Well, if I can respond to that?
22           You know, regardless of whether or not the
23   administrative record already militates the weight in favor
24   of the plaintiff, that's not the issue.  Mr. Begos is
```

1                              PROCEEDINGS                    38

2   arguing that an arbitrary and capricious standard review is

3   going to apply in this case.  If that's true, the Second

4   Circuit has directed -- it was the *McCauley* case -- that

5   the amount of weight that's given to the conflict is

6   proportional to the amount of evidence regarding the

7   conflict that can be produced.  So if I can produce more

8   evidence to show that more weight should be given to the

9   conflict rather than less weight, that's what discovery's

10  about.  That's what the supreme court is basically

11  directing courts to allow plaintiffs to do in these cases.

12           MR. BEGOS:  And I'll just say I disagree with

13  that.  I can go into it in more detail if your Honor wants,

14  but I'm not sure --

15           THE COURT:  No.  With respect to one, Document

16  Request No. 1, I'm denying plaintiff's request.  I think

17  that's excessive and not proportional to what the plaintiff

18  needs.  Same thing with Request No. 2.  Same thing with

19  Request No. 3.  Same thing with Request No. 4.  Five is

20  moot, based on the representations.  Six we've already

21  discussed; Mr. Begos will ask his client if there's any

22  additional information or documents concerning procedures

23  with respect to claims for individuals with fibromyalgia

24  or chronic fatigue syndrome.  Seven is --

```
 1                         PROCEEDINGS                    39
```

2          MR. BEGOS:  And could I just say is that formal

3  procedures I'm assuming your Honor is talking about?

4          THE COURT:  Anything that appears written on the

5  Intranet or in a manual provided for the use of benefit

6  claim administrators, either at the initial claim phase or

7  on appeal.

8          MR. BEGOS:  That's fine.  Thank you.

9          THE COURT:  And 7 is moot because you've produced

10  the CVs.  Nine I'm denying for the same --

11          MR. DELOTT:  You skipped over No. 8.  I

12  didn't -- you know, defendant produced the job description,

13  but there was no resume.  And I said if they don't have a

14  resume, just tell me, and then I'll withdraw that

15  objection.

16          MR. BEGOS:  I think there is one.  I think it's

17  coming.  I'll probably be able to -- UNUM's closed today

18  because of the blizzard up in Portland, but I should

19  probably have Mr. Peters' resume this week.

20          THE COURT:  Okay.  So that will be moot.  Nine

21  I'm denying for the same reason I'm denying the other

22  request concerning personnel and compensation information.

23  Ten, let's hold off on 10 for a second.  I'm going to go to

24  the next Document Request, which is 12, which is all

PROCEEDINGS                    40

1

2  documents concerning procedures that First UNUM has to

3  ensure its benefits determinations advise of disability

4  comply with the policy and the other items listed there.

5  Mr. Begos, is this the same manual that's already been

6  produced that you've made reference to?

7           MR. BEGOS:  Yes, your Honor.

8           THE COURT:  All right, so --

9           MR. DELOTT:  Well, the issue there is I've gone

10 through that manual.  I don't see any section, any chapter

11 that pertains to those.

12          THE COURT:  Well, then you can make your argument

13 that they don't provide that training.

14          MR. DELOTT:  But aren't I allowed to know that

15 prior to summary judgment?  Isn't that the purpose of

16 discovery?

17          THE COURT:  Well, Mr. Begos has represented to

18 you that this is the only thing there is, in which case he

19 can't use anything --

20          MR. DELOTT:  No, no, no, that's not what I'm

21 saying.  Aren't I entitled to know what they are contending

22 is responsive to those four sections?  In other words, he's

23 saying that they've produced the claims manual, and the

24 relevant information pertaining to those four subsections

```
 1                         PROCEEDINGS                    41
 2   is in that claims manual.  But I've gone through the claims
 3   manual; I don't see anything, from my analysis, that's
 4   relevant to those four.  Now, if he's saying, you know, if
 5   he wants to say, "You're right, those four things aren't
 6   covered by a claims manual," I'm happy to accept that.  But
 7   if he's saying that there is something, then I'd like him
 8   to identify it, produce those documents.
 9            THE COURT:  Is there anything that specifically
10   addresses --
11            MR. DELOTT:  He specifically said that this is a
12   massive claim file.
13            MR. BEGOS:  Your Honor, I haven't tried to look
14   through the claim manual and to see whether Mr. Delott's
15   formulation of questions is dealt with.  But certainly, I
16   know for a fact that the claim manual deals with, you know,
17   deciding claims based on the governing policy.  That's on
18   virtually every page of the claim manual.  There certainly
19   are procedures dealing with communications with claimants
20   and keeping them informed.  So maybe the words don't appear
21   in the way Mr. Delott is looking for them, but there's
22   absolutely information in the claims manual about these
23   questions.
24            THE COURT:  So I'm going to deny your request as
```

```
 1                         PROCEEDINGS                    42
 2  to 12 based on Mr. Begos's representation.  And you can
 3  make whatever arguments you can out of the absence of
 4  policies.  If you think that that's a failure to train and
 5  that creates issues, you are free to argue that.
 6             All right, then 13 through 20.  So 13, you're
 7  looking for documents related to medical opinions
 8  supporting the benefit decision; 13, you're looking for
 9  that.  Fourteen, you're looking for a similar -- you're
10  asking for the defendant to point to documents again; same
11  thing with 15; same thing with 16; same thing with 17; same
12  thing with 18.  So these are all requests related to what
13  documents within the administrative record would support or
14  contradict the discontinuation of benefits.
15             MR. DELOTT:  I'm trying to prepare for summary
16  judgment.  In order to prepare for summary judgment, I need
17  to have evidence that's going to support my claims.  If I
18  have responses that indicate that there are no documents
19  that support a change or an improvement in condition, if
20  there are no documents that indicate that the prior
21  decision was wrong, then in fact I have admissions that
22  will greatly strengthen my summary judgment papers.  I
23  shouldn't have to wait until getting their paper to put in
24  my opposition and respond for the first time at evidence.
```

```
 1                        PROCEEDINGS                  43
 2  If there is something that they're contending -- are
 3  documents they're contending provide that information, then
 4  I need to know it now.  That's how I have to prepare for my
 5  summary judgment.
 6            THE COURT:  Okay.  And then 18, we have -- let me
 7  make sure I'm looking at the right one -- I mean 19, I
 8  think we're on 19 -- is 19 concerning the individual
 9  disability policy?
10            MR. DELOTT:  Yes.
11            THE COURT:  And same with 20, is that right?
12            MR. DELOTT:  That's correct.
13            THE COURT:  You have a copy of the individual
14  disability policy, because your client --
15            MR. DELOTT:  The policy.
16            THE COURT:  -- I assume, paid the premiums for
17  that?
18            MR. DELOTT:  Correct.
19            THE COURT:  And I understand that a different
20  subsidiary of First UNUM was responsible for administering
21  that claim?
22            MR. BEGOS:  Correct.
23            THE COURT:  And are you obtaining the record?
24            MR. BEGOS:  We are.  It was supposed to be up to
```

```
 1                          PROCEEDINGS                    44
 2   Portland today; but, again, they're closed.  So hopefully,
 3   allowing for a little lateness, it may be this week that at
 4   least UNUM will have it.  We'll review it.  I would think
 5   that we'd produce it.  I mean, unless there's something
 6   really strange, we probably would just produce it.  I don't
 7   think it's relevant, but --
 8            THE COURT:  All right.  But her benefits have
 9   been approved through -- they were approved through May of
10   2016 under that policy?
11            MR. DELOTT:  Yes.
12            THE COURT:  And then were they discontinued?
13            MR. DELOTT:  Well, that was the end --
14            THE COURT:  Oh, that was the cap?
15            MR. BEGOS:  Yeah, this was a 24-month policy, I
16   believe.
17            THE COURT:  Okay.  I understand.  So you'll
18   produce the administrative record on that?
19            MR. BEGOS:  Yeah.
20            THE COURT:  All right.  So 19 and 20, First UNUM
21   will produce the administrative record on that.
22            All right, so what I'm going to allow is one
23   deposition of Mr. Adams.
24            MR. BEGOS:  Peters.
```

```
 1                        PROCEEDINGS                    45

 2            THE COURT:  Peters.  Adam Peters.  Okay.  Of Adam

 3   Peters.  And that should be limited to issues related to

 4   documents relied on for the decision within the

 5   administrative record.  And I'll permit some questions

 6   related to conflict of interest, but I'm not going to

 7   permit invasive questions as to his performance reviews,

 8   compensation and benefits.  I'll permit general questions

 9   regarding compensation; for example, whether or not he gets

10   paid a bonus based on claim determinations.  And he can

11   explain that generally.  But I'm not going to permit

12   invasive questions about compensation benefits,

13   performance, discipline; only those more general questions

14   to get at whether there would be an incentive for the

15   claims -- the benefit decision maker to be operating under

16   a conflict of interest.

17            If after that deposition there's more information

18   to support a conflict of interest, then we can revisit some

19   of the document requests.  But for now, I think I've

20   already said what I'm going to deny in 1 through 9.  For 10

21   I'm going to deny that document request.  You can ask

22   Mr. Peters whether he had information on the financial

23   reserve or whether he had access to it, and you can ask him

24   whether he knows if anybody else or had discussions with
```

```
 1                        PROCEEDINGS                    46
 2  anybody about that.  As to -- I think we've dealt with the
 3  procedural manuals as to 12.  Mr. Begos, just confirmed
 4  again that there's nothing else particular on the Intranet
 5  that are relevant and responsive to Request No. 12.  With
 6  respect to 13 through 18, I'm going to deny those requests
 7  because you can learn that in the deposition of Mr. Peters.
 8  And I think that will be a more efficient way to learn that
 9  information.
10           Okay.  Now, are there also interrogatories at
11  issue?
12           MR. BEGOS:  Yes.  Your Honor, before we leave
13  Mr. Peters, where should that deposition be?  We have a
14  dispute over --
15           THE COURT:  So I understand that Mr. Delott wants
16  to take it here in the courthouse?
17           MR. BEGOS:  Correct.  And our position is it
18  needs to be up in Portland, where Mr. Peters works, since
19  he's not a managing agent in the company.
20           THE COURT:  Well, can you take a video
21  deposition?
22           MR. DELOTT:  You know, with the number of
23  documents, that's just going to be too unwieldy.  That's
24  just -- it's not going to work; it would take twice as long
```

```
 1                        PROCEEDINGS                    47
 2   to pass documents back and forth.  I don't want to have to
 3   give him the documents in advance.  That really doesn't
 4   work.
 5             THE COURT:  Okay.
 6             MR. DELOTT:  I mean, I --
 7             THE COURT:  So then I --
 8             MR. BEGOS:  Well, I would just say that he's
 9   limited to the administrative record, so Mr. Peters could
10   be sitting in Portland with the administrative record in
11   front of him.  It's Bates stamped, and Mr. Delott can refer
12   him to a page number, and Mr. Peters can turn to that page
13   number, and he can ask him whatever questions he wants.
14   And that way Mr. Delott doesn't have to travel to Portland,
15   Mr. Peters, who's not a managing agent, doesn't have to be
16   brought down to New York to testify, and it would seem that
17   that would accomplish everybody's goals.
18             MR. DELOTT:  I don't believe it does.  You know,
19   I don't want to be able to -- I don't want to be in a
20   position where I can't see who else is in the room.  I
21   don't want to be in a position where I can't see, you know,
22   hear what's going on.  It's far more cumbersome.  You know,
23   I don't know if there's -- you know, I don't want to have
24   to even speculate as to information that's being provided
```

```
 1                        PROCEEDINGS                    48

 2   when I'm not in the room.  But even putting that aside, I

 3   want to be able to see up close -- I mean, a video

 4   deposition's really not going to let me view the demeanor.

 5   You know, there's a very good chance both summary judgment

 6   motions can be denied.  The Court can then move for a bench

 7   trial, and a bench trial can require live testimony.  I

 8   mean, that's another reason why I'm entitled to assess the

 9   demeanor.  I mean, there are -- you know, besides that,

10   there's also an outside possibility, if the judge wants to

11   proceed with Rule 39, that there could be a jury trial.  I

12   mean, there are multiple reasons why a video --

13            THE COURT:  Okay, so you're in Melville, you're

14   in Sanford, and the --

15            MR. BEGOS:  I have an office in midtown

16   Manhattan.

17            THE COURT:  And the witness is in Portland.

18            MR. BEGOS:  Can I just respond briefly to what

19   Mr. Delott said?

20            THE COURT:  Sure.

21            MR. BEGOS:  Everything he said is a vanishingly

22   small probability.  You know, have there been trials in

23   ERISA cases?  A couple, where witnesses have testified.

24   But if Mr. Delott thinks that that's a possibility here and
```

1                              PROCEEDINGS                    49

2    thinks that it's important to look into the witness's eyes,

3    then he certainly can do that in Portland.  But I think

4    there's no -- the Court shouldn't order Mr. Peters, who's a

5    nonparty, to come down to New York to testify; and I think

6    the video deposition is an excellent compromise solution

7    here.  And if it's not satisfactory to Mr. Delott, he's

8    free to come up to Portland to depose Mr. Peters.  But I

9    don't think because he's not satisfied with that and

10   because he thinks there's a, you know, half a percent

11   chance that Mr. Peters may testify in this case, which I

12   think is nonexistent, that Mr. Peters should have to come

13   down to New York to satisfy Mr. Delott.

14             MR. DELOTT:  Well, it's a false premise that he's

15   a nonparty.  UNUM's claim representatives have been

16   compelled to come into the forum and be deposed multiple

17   times.  I cite many of those cases; most of them are his

18   cases.  And as for it being a rarity that a trial might

19   require live witness testimony, that's his *McCauley* case.

20   So, I mean, it's not that rare if -- I mean, he's already

21   involved in one of those cases.  But it's also the

22   inconvenience to me.  I mean, this is a case where UNUM

23   registered to do business in the state, in the forum.

24             THE COURT:  I'm going to -- if you're very

1                            PROCEEDINGS                    50

2    opposed to the video deposition, I'm going to order the

3    deposition to take place in New York.  It's the plaintiff's

4    prerogative whether he wants to take the deposition in the

5    courthouse versus your office.  So if you want to take it

6    in the courthouse, you can follow the procedures to get a

7    deposition room in the courthouse.  But it's going to be

8    limited in time to the seven hours -- and probably you need

9    less than that.  But you'll have that amount of time

10   permitted under the rules.

11          All right, can we move to interrogatories?

12          So I have the interrogatories, Mr. Begos,

13   Document 32, which ones are we dealing with now?

14          MR. BEGOS:  My list, your Honor, is 2 through 8

15   and 10 through 13.

16          THE COURT:  Okay, so 2 -- 2 deals with the same

17   issue as the document request, and I think you can deal

18   with that on the deposition of Mr. Peters.  Same thing for

19   interrogatory No. 3; same thing for interrogatory 4; same

20   thing for interrogatory 5; same thing for interrogatory 8;

21   same thing for 10.  Okay, so for those interrogatories I'm

22   going to deny -- I'll grant -- I guess this is plaintiff's

23   motion to compel?

24          MR. DELOTT:  Yes.

```
 1                         PROCEEDINGS                  51

 2              THE COURT:  So I'm going to deny as to those

 3    requests because I think you can get the answers in the

 4    deposition of Mr. Peters.

 5              MR. DELOTT:  And if Peters is unable to provide

 6    those answers, will I be able to have those interrogatories

 7    and document requests?

 8              THE COURT:  You can reapply to the extent it's

 9    necessary.

10              MR. DELOTT:  Understood.

11              THE COURT:  Okay, so then let's move to the

12    remainder, which I believe would be 7.  So that's the

13    financial --

14              MR. BEGOS:  Six, as well, your Honor, which is --

15              THE COURT:  Oh, the medicals.  Yes.  Thank you.

16    So during the last -- the medical -- the number of medical

17    file reviews.  I'm going to deny that request.  Again, I

18    think that this is excessive and not proportional to the

19    needs of the case.  In terms of 7, if after you depose

20    Mr. Peters and you learn information that brings the

21    financial reserve information into relevance, then we can

22    reconsider No. 7.  But for now, the motion to compel is

23    denied.

24              And the remaining ones, I think 11, 12 and 13
```

```
 1                        PROCEEDINGS              52
 2   deal with the individual policy as compared to the group
 3   policy, is that right, Mr. Delott?
 4           MR. DELOTT:  Well, yes.  I mean, they don't track
 5   the document requests, but they do relate to the
 6   individual policy.
 7           THE COURT:  So you're going to get the
 8   administrative record for the individual --
 9           MR. DELOTT:  So that takes care of No. 11, yes.
10           THE COURT:  You're going to get the
11   administrative record.  So I think that takes care of
12   No. 11.  No. 12, how the definitions of disability
13   differed, you're going to have that just from the two
14   different policies, which I believe you have.  The
15   definitions of disability will be set forth in the policy
16   documents.
17           MR. DELOTT:  Yes.  But I'm entitled to understand
18   what their contention is if there's a difference.
19           THE COURT:  Well, if the words are the same,
20   they're the same.
21           MR. DELOTT:  Well, the words might be the same,
22   but if they're interpreting differently the same words --
23           THE COURT:  But the problem with this question is
24   it's a contention interrogatory.  It's premature for
```

```
 1                         PROCEEDINGS                    53
```

2    contention interrogatories.  Under the Southern District

3    rules you're not permitted to do a contention interrogatory

4    at the beginning stage of a case.  And at this point you

5    don't know whether Mr. Peters even considered or knew about

6    the individual disability policy.  So you can ask him that

7    question when you depose him.  If he didn't know about or

8    didn't consider the definition of disability under that

9    policy, I don't see how it's relevant.

10         MR. DELOTT:  Well, I can tell you how it's

11    relevant because under the claims manual that UNUM just

12    produced, this is called a "common claim," and they're

13    supposed to reference the common claim, including IDI, who

14    they specifically reference.

15         But I just want to clarify, are you saying

16    that -- I mean, there's a conference -- a scheduling order,

17    and there's a discovery cutoff point, which I believe is in

18    several weeks.  Are you saying that I'm going to be allowed

19    to ask contention interrogatories after the discovery

20    cutoff?  Because if I can't ask contention interrogatories

21    now, when can I?

22         THE COURT:  Well, it seems to me, based on what

23    you just said, you can ask Mr. Peters this question based

24    on the claim policy.  When will you be able to take that

```
 1                        PROCEEDINGS                    54
 2   deposition of Mr. Peters?
 3             MR. BEGOS:  Well, I was going to bring that up.
 4   Generally there is significantly greater lead time to get
 5   somebody down here, because it requires a couple of people
 6   coming down.  And I know from prior experience that, you
 7   know, managers don't like to let people go.  So generally
 8   it has taken a couple of months to get a mutual -- you
 9   know, a date that's convenient to everybody to have a
10   witness down in New York.  I don't know Mr. Peters'
11   availability.  I don't know off the top of my head the
12   availability of in-house counsel, who would also be coming
13   down for that deposition.
14             THE COURT:  All right.  Let me just pull up the
15   Case Management Plan.  Fact discovery is to be completed by
16   April 17.
17             MR. DELOTT:  I thought it was March.
18             THE COURT:  April 17.  Depositions shall be
19   completed by March 17.  No additional parties may be joined
20   after today.  So it's still early in the discovery of this
21   case.  You can ask a contention interrogatory in March,
22   after -- you can ask this contention interrogatory in March
23   after the deposition of Mr. Peters.
24             MR. BEGOS:  Your Honor, can I just, before we
```

1                            PROCEEDINGS                    55

2  leave the subject of 12, because I heard your Honor saying

3  that Mr. Delott could ask Mr. Peters that question.  And,

4  you know, if he asks him that in a deposition, I'm going to

5  object to it because it's calling for a legal conclusion

6  that Mr. Peters is not competent to give, to look at two

7  definitions of disability and explain whether they're

8  different and what the difference is.  I think it would be

9  appropriate, as your Honor initially said, that if

10 Mr. Peters looked at the other policy and actually made

11 some determination in his mind that there's a difference,

12 that's fair game.  But to ask him to look at two policies

13 and interpret them for Mr. Delott is improper.

14         THE COURT:  Well, he's -- what I think is

15 appropriate to ask Mr. Peters is if he was aware of the

16 individual policy, if he has ever adjudicated a claim

17 under that particular policy, and from his understanding as

18 a benefit claim administrator does he read that definition

19 in a different way than he does the definition of

20 disability under the group policy.  I think those are not

21 legal questions; I think you can ask those questions.

22         And in terms of 13, this is not an appropriate

23 question for Mr. Peters because we know that Mr. Peters

24 wasn't involved with the individual claim.  And, frankly,

```
 1                          PROCEEDINGS                    56
 2   based on the information that's been provided to the Court
 3   so far, it doesn't appear that there was any
 4   reconciliation.  There was one entity making one decision
 5   under the individual policy and another entity making a
 6   decision under the group policy, and that's the way it was.
 7   But you're going to get the administrative record, and you
 8   can pose this contention interrogatory, if you wish, in
 9   March.  Or we'll just -- I don't think there's a need to
10   re-serve it; I think if you're not going to withdraw it and
11   you're going to keep it, then defendant can answer it by no
12   later than April 1, which will be after production of the
13   administrative record on the individual claim, after the
14   depositions.  Okay.
15          So I think that addresses all of the
16   interrogatories that are at issue, the depositions, and the
17   document requests.  And I understand there's another
18   dispute brewing that's not ripe yet.  What is happening
19   with that?
20          MR. BEGOS:  There's three additional discovery
21   requests that we received in the last couple of weeks.  The
22   response to the second set of interrogatories and document
23   requests is due on the 16th, I believe.  And I just sent
24   Mr. Delott an e-mail this morning asking if we could put
```

```
 1                          PROCEEDINGS                   57

 2   that off for two weeks because people are unavailable to

 3   answer them.  I mean, the likelihood is we'll probably be

 4   objecting to most of them.  But I'd like to have two weeks

 5   to respond.  The response to the third set of discovery

 6   requests, which contains interrogatories and document

 7   requests, is due --

 8           MR. DELOTT:  It contains a single interrogatory

 9   and document request.

10           MR. BEGOS:  Okay.  That's due sometime in March;

11   I don't remember the date.

12           THE COURT:  To the extent they're contention

13   interrogatories, defendant's due date will be April 1 for

14   all contention interrogatories, consistent with Southern

15   District procedural rules.  To the extent they are

16   interrogatories seeking people with information and

17   knowledge about certain things, that's a different

18   situation.

19           All right, and so that's -- in terms of the --

20   what's the deadline that you're requesting?

21           MR. BEGOS:  For the second set, I'd request two

22   weeks from the 16th.  Let's see, I put that in an e-mail to

23   Mr. Delott -- so two weeks from Thursday would be great.

24           THE COURT:  Meaning March 2?
```

```
 1                        PROCEEDINGS                58
 2            MR. BEGOS:  Yes.
 3            THE COURT:  And are there documents that you're
 4  seeking --
 5            MR. BEGOS:  Most of these, your Honor, are
 6  related to the things that you already ruled on.  So there
 7  are, you know, documents regarding liability acceptance
 8  rates for disability claim specialists involved in the
 9  claim, documents concerning the reserve.  So there's, you
10  know, slight nuances, but they're -- I think most of them
11  are similar to what you already ruled on.
12            THE COURT:  So I'm going to -- okay, you can have
13  until the 30th to respond to those.  And --
14            MR. BEGOS:  The --
15            THE COURT:  I think it's --
16            MR. BEGOS:  -- the 2nd?
17            THE COURT:  I'm sorry, the 2nd.  I'm looking
18  at -- my cursor's on the wrong day -- the 2nd of March.
19  And you should schedule the deposition of Mr. Peters within
20  the next few weeks.  And --
21            MR. BEGOS:  I'll do my best on that.
22            THE COURT:  Mr. Delott, what I'd like you to do
23  is take that deposition, review the additional information
24  that's being produced to you.  And at this point you've
```

```
 1                       PROCEEDINGS                    59
```

```
 2  served quite a number of interrogatories and document

 3  requests.  I'm going to instruct you not to file any ones

 4  that are redundant of ones that already have been served.

 5  And if you want to renew your requests for particular

 6  documents, you can do that through a letter to First UNUM.

 7           MR. DELOTT:  Right.  Following the depo.

 8           THE COURT:  Following the depo.  Exactly.  But

 9  let's not create additional work for responding.  If you

10  already have in sum and substance asked for the types of

11  documents, you don't need to serve another document for the

12  defendant to answer.

13           MR. DELOTT:  I'm sorry, but I got a little

14  confused.  I thought I heard February 30, and I heard

15  March 2.

16           THE COURT:  February 2 -- wait a minute.  Hold

17  on.  March 2 is the day that defendant will provide

18  responses and objections to your more recent document

19  requests and interrogatories.  March 17 is the cutoff for

20  depositions.  Mr. Peters' deposition should be scheduled

21  prior to then.  You may renew requests for documents or

22  serve additional contention interrogatories, to the extent

23  they are not redundant of what you have already served,

24  after you have deposed Mr. Peters.  And defendant's time to
```

```
 1                          PROCEEDINGS                    60
 2  answer contention interrogatories will be extended to
 3  April 1 -- any existing contention interrogatories, which
 4  are just the two, essentially, that we went over today and
 5  any new ones that you're dealing with now.
 6            Anything else?
 7            MR. DELOTT:  Referring to No. 10 and 13 through
 8  18?
 9            THE COURT:  Yes.
10            MR. BEGOS:  No, it's not 13 through 18.  Those
11  were --
12            MR. DELOTT:  No, those are the documents.
13            THE COURT:  Those are document requests.
14            MR. DELOTT:  Right.
15            THE COURT:  I think it was just --
16            MR. BEGOS:  Twelve and 13.
17            THE COURT:  -- 12 and 13.
18            MR. BEGOS:  One quick thing about the deposition
19  location.  I know that, as you said, it's Mr. Delott's
20  choice as to where to do it.  From our conversations trying
21  to resolve this dispute, his belief that it should be at
22  the courthouse was that there would be more ready access to
23  your Honor to the extent there were disputes arising during
24  the deposition.  My feeling would be a phone call would be
```

```
 1                          PROCEEDINGS                    61
 2   just as -- if your Honor's available, your Honor's
 3   available.  But perhaps -- I guess I'm asking for your
 4   Honor's point of view --
 5             MR. DELOTT:  I gave that as one example.
 6             MR. BEGOS:  -- as to whether there's an advantage
 7   to us having the deposition at the courthouse to the extent
 8   Mr. Delott sees a need to reach out to your Honor during
 9   the deposition.  Because I'm still holding out hope that I
10   can convince him to do it at my office in Manhattan.
11             THE COURT:  I don't -- I can come to a courtroom
12   as fast as I can answer a phone.  And when I'm available,
13   I'm available.  So I don't even know what day it is or
14   whether I'll be here, so -- (Stopped talking.)
15             MR. BEGOS:  Right.  I guess the question that
16   I had -- and I asked it very poorly is -- from your
17   Honor's perspective, if there is a dispute during the
18   deposition, is it better that we're here in the courthouse
19   or calling in by phone, or does it make no difference to
20   your Honor?
21             THE COURT:  It makes no difference.
22             MR. BEGOS:  Okay.  Thank you.
23             THE COURT:  All right.  Anything else?
24             MR. BEGOS:  No, your Honor.
```

```
 1                        PROCEEDINGS                    62

 2           THE COURT:  Anything else?

 3           MR. DELOTT:  No, your Honor.

 4           THE COURT:  Okay.  Have a good afternoon.

 5           (Whereupon, the matter is adjourned.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

63

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of McFarlane v. First

UNUM Life Insurance Company, Docket #1:16-cv-07806-RA-KHP,

was prepared using digital transcription software and is a

true and accurate record of the proceedings.

Signature_____

Carole Ludwig

Date:    February 20, 2017